UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DAVID NEWALL GRANT, | ) |
| | ) |
|     Petitioner, | ) |
| | ) |
| v. | ) Civil No. 09-158-B-W |
| | ) |
| JEFFREY MERRILL, WARDEN, | ) |
| MAINE STATE PRISON, | ) |
| | ) |
|     Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

David Grant, who is serving a 70-year sentence for the murder of his mother-in-law, has filed a 28 U.S.C. § 2254 petition asserting one ground that has been fully exhausted in the state courts. Grant challenges the state courts' determination vis-à-vis the denial of a motion to suppress because of an asserted Fifth Amendment/ Miranda v. Arizona, 384 U.S. 436 (1966) violation when Grant gave incriminating statements after he had invoked his right to remain silent in a prior interview attempt. Viewing the Maine Law Court's determination through the lens of § 2254(d)(1) deference as I must, I recommend that the court deny Grant 28 U.S.C. § 2254 relief.

*Discussion*

*Basic Contour of Grant's Fifth Amendment Claims*

    The Maine Law Court summarized the factual context of the claim as follows:

On November 30, 2004, Grant left his work in the mid-afternoon, purchased cocaine, and after ingesting about a half-ounce of the drug, drove to the home of his mother-in-law in Farmingdale. An argument ensued, and Grant attacked her. When she was dead or nearly dead, he tied her hands behind her back, loaded her into the back of his pick-up truck, and dumped her into an empty field. Her body was found the next day. A later autopsy showed that the cause of her death was blunt force trauma and exsanguination from stab wounds.

At 11:30 p.m. on November 30, before the body was found, law enforcement officers were dispatched to the scene of a single vehicle accident on Route 2 in Palmyra. At the scene, the officers discovered Grant in the cab of his pick-up truck, which had gone off the side of the road and into a ditch. A considerable amount of blood was observable in the bed of the truck. The police officers found Grant moving about in the cab, waving a knife, and repeatedly thrusting the knife into his own throat. The officers smashed a window of the truck and shocked Grant multiple times with a taser to subdue him. The officers were then able to wrestle away the knife, handcuff Grant, and extract him from the truck.

Once Grant was out of the truck, officers secured him, handcuffed, to a long board. Grant was placed into an ambulance that had been called to the scene. A law enforcement officer accompanied Grant to Eastern Maine Medical Center in the ambulance. At the hospital, Grant underwent emergency surgery, which was completed in the early morning of December 1.

In the hours following Grant's surgery, detectives made four attempts to interview him in the hospital at 4:26 a.m., 9:51 a.m., 11:45 a.m., and 1:42 p.m. Grant was not sufficiently conscious or coherent to make a statement during the first three interrogations. During the final interrogation on December 1, at 1:42 p.m., Grant told a detective, in response to his Miranda warnings, that he did not wish to talk. The detectives immediately ceased questioning Grant and executed a previously obtained search warrant on Grant's body and clothing. Grant remained hospitalized, and the next day, December 2, a detective returned to the hospital room to question Grant again, beginning at 9:03 a.m. During that interrogation, after receiving new Miranda warnings, Grant made numerous incriminating statements.

State v. Grant, 2003 ME 1, ¶¶2-5,  939 A.2d 93, 96.[1]

---

[1] In his 28 U.S.C. § 2254 motion Grant explains his single ground thusly:
Immediately upon his arrest, Grant was immediately transported to the hospital where he underwent surgery for stab wounds to his neck.  A police officer accompanied Grant to the hospital and at all times, a police officer was stationed outside of Grant's hospital room.  In the hours following Grant's surgery, detectives made four attempts to interview Grant in the hospital at 4:26 A.M., 9:51 A.M., 11:45 A.M., and 1:42 P.M.  During the first three interrogations, Grant was not sufficiently conscious and coherent to make a statement.  During the final interrogation, Grant told a detective he did not wish to talk.  The Maine Law Court found as a fact that Grant was in police custody at the time he invoked his Miranda rights and that the invocation of those rights was clear and unequivocal.  The next day, at 9:30 A.M., a detective returned to the hospital room and again interrogated Grant about the same incident, even though Grant remained in custody and had invoked his 5th Amendment right to remain silent.  Grant made incriminating statements which were admitted in the trial against him over objection.
(Sec. 2255 Mot. at 5.)

The portion of the Miranda reasoning implicated by Grant's claim is the following explanation pertaining to Fifth Amendment protocol once a police interviewee invokes a right to remain silent after receiving a Miranda warning:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. at 473-74 (footnote omitted). At the center of Grant's claim is the interpretation of Miranda in Michigan v. Mosley, 423 U.S. 96 (1975) and its holding:

> A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." 384 U.S., at 479. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Id., at 474. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his "right to cut off questioning" was "scrupulously honored."

423 U.S. at 103-04.

Mosley identified factors that are to be considered in making a voluntariness determination in this context. As to these, the First Circuit has summarized:

> The Supreme Court in Mosley identified four factors relevant to this analysis: (1) whether a significant amount of time lapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of Miranda warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously

> cut off by the suspect. [Mosley, 423 U.S] at 104-06. Courts must look to the totality of the circumstances, and "[t]he key inquiry remains whether defendant 'was in charge of the decision whether and to whom he would speak.' " United States v. Thongsophaporn, 503 F.3d 51, 57 (1st Cir.2007) (quoting [United States v.] Andrade, 135 F.3d [104,] 107 [1st Cir. 1998)]).

United States v. Lugo Guerrero, 524 F.3d 5, 12 (1st Cir. 2008); see also United States v. Barone, 968 F.2d 1378, 1383 -84 (1st Cir. 1992) ("In evaluating law enforcement conduct pursuant to Mosley, courts must consider, inter alia, the time that elapsed between interrogations, whether fresh warnings were provided, the scope of the second interrogation, and the intensity with which the officers pursued questioning after the suspect asserted the right to silence.")(citing Mosley, 423 U.S. at 104-05).[2]

### *28 U.S.C. § 2254 Review and the State Court Resolution*

With regards to this court's review of Grant's Fifth Amendment claim, I am constrained a great deal more than were a motion to suppress raising similar facts before me in a federal prosecution. Congress has directed that this Court shall not grant a petition for habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the Maine court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). Any factual findings "shall be presumed to be correct" and Grant bears the burden of disproving these factual findings by "clear and convincing

---

[2]     A comparison of the factors identified in Lugo Guerrero and Barone illustrates that the First Circuit does not think that there is an exhaustive or exclusive list of factors for making the voluntariness determination in Mosley-type cases. And, as the Maine Law Court observed, courts have broken the inquiry into four or five factors but the substantive analysis remains the same. Grant, 2008 ME 14, ¶ 42 n.7, 930 A.2d at 104 n. 7. I highlight Lugo Guerrero because it does include the express phrasing of whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect, a Mosley inquiry that is key to this dispute.

evidence." 28 U.S.C. § 2254(e)(1). See also O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir. 2009); McCambridge v. Hall, 303 F.3d 24, 34-35 (1st Cir. 2002). As becomes clear below, a Mosley-driven analysis necessitates many factual findings.

First, there is no question that the Maine Law Court's decision is "a run-of-the-mill state-court decision applying the correct legal rule" from United States Supreme Court precedent -- to wit, Miranda and Mosley -- to the facts of Grant's case and that its determination does not run afoul of the § 2254(d)(1)'s "contrary to" clause. Williams v. Taylor, 529 U.S. 363, 406 (2000) (O'Connor, J. delivering the opinion of the Court as to Part II); see also Gore v. Sec'y for Dept. of Corr., 492 F.3d 1273, 1297 (11th Cir. 2007). Thus, with respect to the Maine Law Court's legal conclusions, the fate of Grant's Fifth Amendment claim turns on the "unreasonable application" inquiry. See Williams, 592 U.S. at 409 – 13. "Under § 2254(d)(1)'s 'unreasonable application' clause … a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 362. See Fleming v. Metrish, 556 F.3d 520, 528 -30 (6th Cir. 2009) (addressing the standard in context of a Miranda/Mosley "scrupulously honored" claim); Gore, 492 F.3d at 1297 – 99 (addressing the standard in context of a Miranda/Mosley "scrupulously honored" claim); Weeks v. Angelone, 176 F.3d 249, 267 -69 (4th Cir. 1999) (addressing the standard in context of a Miranda/Mosley "scrupulously honored" claim); Hebert v. Cain, No. 03-31158, 2005 WL 147260, 4 (5th Cir. Jan. 24, 2005) (unpublished) (addressing the standard in context of a Miranda/Mosley "scrupulously honored" claim); see also e.g., Easley v. Frey, 433 F.3d 969, 972 -75 (7th Cir. 2006); McGraw v. Holland, 257 F.3d 513, 516 -520 (6th Cir. 2001);

Burket v. Angelone, 208 F.3d 172, 199 -201 (4th Cir. 2000); Lanosa v. Frank, No. 07-16823, 2008 WL 5341856, 1 (9th Cir. 2008) (unpublished).

In sum, the 'scrupulously honored' 'unreasonable application' inquiry "is a mixed question of fact and law" leaving this court "with two independent inquiries," that is, whether the Maine Law Court's "decision represents an unreasonable application" of Miranda and Mosley "and whether the decision resulted from an unreasonable determination of the facts." Gore, 492 F.3d at 1297 -98. I take the latter inquiry first.

### *Factual Presentation and Determination*

Grant is constrained in this 28 U.S.C. § 2254 proceeding by the factual presentation he made to the state courts. See 28 U.S.C. § 2254(e)(1), (2). Accordingly, in the context of this particular dispute, I turn to Grant's presentation of his facts to the Maine Law Court in his appellate brief wherein he sets forth the facts he considered relevant to his Fifth Amendment challenge[3]:

> **First Attempted Interrogation**
> Detective Dean Jackson made the first attempt to interrogate Grant on December 1, 2004 at 4:26 A.M. (Tr. 66.) At that point, Grant had just come out of surgery and was still recovering in the Intensive Care Unit. (Tr. 66.) Detective Jackson noted that Grant was "coming out of sedation" and "appeared a bit groggy." (Trial Tr. 368.) This attempt was brief, lasting only about 5 minutes, as it appeared that Grant was still too sedated to speak to law enforcement. (Trial Tr. 369.) At trial, Detective Jackson described his first attempt to interrogate Grant as follows:
>> I told him that I wanted to talk to him about a missing person case that I was working on, Janet Hagerthy. And he asked who? And I said your mother-in-law, Janet Hagerthy. And he asked who again. And then he

---

[3] The State of Maine has not provided this court with the transcript of the first four interviews and has not explained why it does not think that these transcripts would assist this court's 28 U.S.C. § 2254 review. However, Grant is represented by counsel and his attorney would have been apprised of the contents of the § 2254 record in framing Grant's reply. Grant has not attempted to supplement the record to provide these transcripts or the transcript of the trial which he relied on in his appellate brief. What is more, in his 28 U.S.C. § 2254 petition Grant does not highlight any infirmities with the Law Court's recitation of the relevant facts set forth below so I do not see any reason why it is necessary to order a supplementation of the record with the transcripts of the other interviews.

6

> just appeared to kind of close (sic) off again – and then at some point he said I'm on my boat right now. And I said are you sailing on a boat right now? And he said, yes. And I asked if he would like us to come back later, and he said yes, and he would like to talk to us later. (Trial Tr. 369.)

**Second Attempted Interrogation**

Detective David Tripp made a second attempt to interview Grant at 9:51 A.M. that same day. (Tr. 78.) At that time, Detective Tripp advised Grant of his <u>Miranda</u> rights, and Grant indicated that he did not want to answer Detective Tripp's questions because his throat was sore. (Tr. 82-83.) Detective Tripp described the attempted interrogation as follows:

> I went in, I approached Mr. Grant and I attempted to interview him. He started talking about having people out on his boat, wanted to know how I got out on his boat. I explained to him that I wasn't on a boat with him, nor was he. And he ended up telling me that his throat was very sore and that he was not able to speak with me at that time because of that. (Trial Tr. 377-378.)

**Third Attempted Interrogation**

Detective Tripp returned to Grant's room that same day at 11:45 A.M., and made a third attempt to interrogate Grant. (Tr. 83.) Detective Tripp again advised Grant of his <u>Miranda</u> rights, and Grant again indicated that he did not wish to answer Detective Tripp's questions because his throat was sore. (Tr. 85.) At that time, Grant also declined Detective Tripp's invitation to answer questions by writing the answers down because he said that his hand were sore. (Tr. 85.) Detective Tripp testified at trial that he asked Grant if could come back later, and Grant said that he could. (Trial Tr. 378.)

**Fourth Attempted Interrogation**

Detective Tripp returned again at approximately 1:42 P.M. that same day, and made a fourth attempt to interrogate Grant. (Tr. 87.) Detective Tripp again advised Grant of his <u>Miranda</u> rights, and after being advised of his rights, Grant indicated that he did not want to answer any questions. (Tr. 91.) Tripp testified that "he again told me that he did not want to speak with me." (Trial Tr. 379.) On this occasion, Grant did not qualify the invocation of his Fifth and Sixth Amendment rights in any manner. (Trial Tr. 379, Tr. 91.)

**Fifth Attempted Interrogation**

Even though Grant had made a clear and unambiguous invocation the previous day, Detective Tripp made a fifth attempt to interrogate Grant on December 2, 2004 at approximately 9:03 A.M. (Tr. 100.) Tripp read Grant his <u>Miranda</u> rights before beginning the interrogation. (App. 100.) Grant "waived" his rights and spoke with Detective Tripp. (Tr. 100.) Grant made incriminating statements during his fifth interrogation. (Tr. 101.) The material portions of the interrogation are excerpted below:

> **Tripp**: Now, having all those rights which I just explained to you in mind, do you wish to talk with me at this time?
> **Grant**: Yes.
> ....

7

**Tripp**: Why am I here to talk to you?
**Grant:** About Janet Hagerthy.
**Tripp:** Okay. And why do you think I want to talk to you about Janet Hagerthy?
**Grant:** I don't know if I should tell you without a lawyer. I just don't know, David, you know?
….
**Tripp:** Okay. And…ah … so she had said something about the whole snow blower thing?[4]
**Grant:** Yeah.
**Tripp:** And… and I mean what did that … what did that do to you? I mean what …
**Grant:** Just set me right off … It's the same thing every year.
**Tripp:** So it's kind of a repetitive …
**Grant:** Yeah, but doesn't year … this time it was like …I don't know what happened. I really don't know what happened. I just totally lost it, I don't know why. I don't know what I've done. I know it's gotta be pretty bad.
….
**Tripp**: Um…how did…how did she get from the garage to your pickup?
**Grant:** I must a put her in it. (Inaudible)
**Tripp:** You want to angle that up? (reference bed) You said you put her in it?
**Grant**: Yea, I must 'ave. That's the only way she could have gotten there.
…
**Tripp:** Okay. And … and I don't expect you to … to be exact because I'm sure that it is …hard for you to remember. Do you remember … do you remember somewhere near ah … or do you recollect somewhere near that about of times that … that you stabbed her?
**Grant:** Geeze, I don't know.
**Tripp:** I mean it wasn't a hundred times, was it?
**Grant:** No, I …I don't believe so … But I don't know.
….
**Tripp**: Okay. So in terms of … in terms of um … in terms of the amount of …times that you stabbed her …your…you can't … I mean, you remember stabbing her but you can't remember how many times?
**Grant**: I don't even remember stabbin' her.
**Tripp:** Okay.
**Grant:** I just don't remember stabbin' her Dave. And if I did, I don't know how many times. I don't know whether it was once, ten, five, three … I just don't know.

---

[4]   To provide some context, although it is not material to the disposition of this 28 U.S.C. § 2254 claim, Grant related during the course of this interview that he went over to his mother-in-law's house to drop off some light bulbs and that during this visit they got into a discussion about how to start the snowblower which was apparently a perennial point of contention between them.

(Appellant Br. at 4-7, State Record B) (some capitalization and some record citation omitted).

The Maine Law Court based its resolution of Grant's <u>Miranda</u>/<u>Mosley</u> challenge to the admission of the incriminating statements on the following factual findings:

1. Grant's First Three Interviews on December 1
   Detectives first attempted to interview Grant at 4:26 a.m., just after his surgery was completed when he was placed in intensive care. Grant, who was awake but sedated, was read his <u>Miranda</u> rights, but his interview was terminated because he was not completely coherent. Grant made a mumbling sound when the detectives asked him if he would like to talk to them later. At 9:51 a.m., a detective again attempted to interview Grant and read him his <u>Miranda</u> rights. Grant, who was still in a foggy state of mind, indicated that he did not want to talk and that his throat was sore. At 11:45 a.m., a detective returned to the hospital room, read Grant his <u>Miranda</u> rights, and attempted to interview Grant again. Grant indicated that he could not converse because his throat was sore and that he could not write because his hands were sore. Grant did not respond when the detective asked him if he should return later.

2. The 1:42 p.m. Interrogation on December 1
   When the detective returned to Grant's room at 1:42 p.m., Grant stated that he did not want to answer questions. The transcript of the interrogation shows that the following exchange occurred after Grant was read his <u>Miranda</u> rights:
   > Detective: Okay. Now, having all those rights which I just explained to you in mind, do you wish to answer questions at this time?
   > Grant: No.
   > Detective: What's that?
   > Grant: No.
   > Detective: No?
   > Grant: (inaudible) answer any questions.
   > Detective: What's that?
   > Grant: I don't want to answer any questions.
   > Detective: You don't want to answer any questions?
   > Grant: No.

   The detective immediately ceased questioning Grant and, authorized by the search warrant, executed a search of Grant's body, during which the detective took hand and nail swabbings, nail clippings, pubic hair combings, a penile swab, and a blood sample. Grant remained hospitalized. The officer's questioning of Grant at that interview ceased by 1:50 p.m.

3. The 9:03 a.m. Interrogation on December 2
   On the following morning, December 2, the detective learned from nurse that Grant had not been given pain medication since the previous afternoon and began another interrogation of Grant, approximately 19 hours after the most recent attempt. Again, the detective read Grant his <u>Miranda</u> rights, and Grant

9

acknowledged them. Grant agreed to speak with the detective. During the interrogation, Grant made numerous incriminating statements regarding his relationship with the victim and the events of November 30. The interrogation was terminated at 9:47 a.m., when Grant stated, "I mean I know I've already told you enough to hang me ... but I think I'd really like to have a lawyer present." Grant was released from the hospital later that day and formally arrested.

4. Additional Evidence not Addressed by the Court

There was additional testimony at the suppression hearing, presented by the State and uncontested by Grant, that was relevant to the court's custody determination, but was not explicitly addressed in the court's findings. Although the motion court found that a police officer accompanied Grant to the hospital, the court considered it significant that this officer was not in uniform. The officer testified at the suppression hearing, however, that he had been wearing a gun-belt at the time and he conceded that he had asked Grant at least one question in the ambulance for "law enforcement purposes." This officer also testified that another officer met them at the hospital and accompanied Grant into the hospital while Grant was still wearing handcuffs.

The transcripts of Grant's interviews show, but the court did not find, that during Grant's first two interviews, the detectives told him that they were looking for the victim, that they knew that Grant had recently been at her home, and that they were investigating the victim's case. These transcripts also show that the detectives made Grant aware that they were receiving updates on his medical condition from the hospital staff.

In addition, the testimony of the detectives at the suppression hearing indicated that throughout Grant's stay at the hospital on December 1, a law enforcement officer was posted in the hallway outside of his room. The court, however, found that there was "no indication that [Grant] would have had any knowledge of this law enforcement presence."

The only evidence on that issue came from a detective who testified that guards would sit in a chair in the hallway outside Grant's room and could see his bed, but not always his head, unless he sat up or moved in his bed. This detective testified that he had watched over Grant's room a few times on the day of December 1 and also after the execution of the search warrant on December 1 until midnight on December 2. The detective testified that while he was on watch, Grant rolled over several times, positioned himself so he could look out into the hallway, and then lay back down. The detective could not say, however, during which specific shifts this occurred. The detective who testified on this issue was the same detective who questioned Grant during the 9:51 a.m., 11:45 a.m., 1:42 p.m., and December 2 interrogations.

State v. Grant, 2008 ME 14, ¶¶ 9-15, 939 A.2d 93, 97-98 (footnotes omitted). The Maine Law

Court further noted that "at one point during the 9:51 a.m. interview Grant was still acting

groggy. After Grant asked the detective how he had gotten on Grant's boat, the detective responded, 'Dave, we're not out on a boat and you know that we're not out on a boat. Okay? You haven't been given a lot of medication. I've talked to the doctors,'" 2008 ME 14, ¶ 13 n.2, 939 A.2d at 98 n.2, and that "[a] second detective testified that he had watched over Grant between midnight and 4:00 a.m. on December 2 and that he had stepped into Grant's room a few times to check on him." 2008 ME 14, ¶ 15 n.3, 939 A.2d at 98 n.3.  The Maine Law Court found error in the superior court's factual conclusions on the inquiries relating to the 'in custody' concern regarding the interrogation inquiry and the clarity of Grant's invocation of his right to remain silent. Grant, 2008 ME 14, ¶¶ 33, 38, 939 A.2d at 103-104.  These being rulings in Grant's favor, he obviously does not challenge the Maine Law Court's conclusions on these issues.

I conclude that the Maine Law Court's key factual findings are perfectly within the parameters of 28 U.S.C. § 2254(e)(2)'s presumption of correctness.  What is more, Grant has certainly not rebutted them with clear and convincing evidence.

### *The Maine Law Court's Application of Law to Facts*

Grant really joins issue with the State over the Maine Law Court's application of the law to these facts.  The Maine Law Court, in ruling on his direct appeal, did an exhaustive evaluation of the claim pressed here.  Ultimately, it rejected the claim reasoning apropos the Mosley "scrupulously honored" factors:

> In the matter before us, the record establishes that the police immediately ceased their questioning of Grant when he invoked his Miranda right to remain silent during the 1:42 p.m. interrogation. They did not speak to him through the remainder of the afternoon and evening, and did not return until 9:03 a.m. the following day. It is also clear that, when questioning did resume, Grant was given fresh Miranda warnings, which he acknowledged that he understood. The subject matter of the police questioning at 9:03 a.m. on the day after Grant invoked his Miranda right to remain silent was the same as it had been the previous day.

> Given these facts, we have no difficulty saying that two of the four factors militate in favor of a conclusion that Grant's invocation of his right to remain silent was scrupulously honored: (1) questioning ceased as soon as Grant invoked his right to remain silent without further badgering or pressure to speak, and (2) Grant was given fresh warnings before being questioned again.
>
> Conversely, the fourth factor weighs against the State because both sets of questions related to precisely the same issues.
>
> The final remaining factor requires further discussion: whether a significant period of time passed between the invocation of the right to remain silent and the questioning that followed. Here, although Grant was recovering from several injuries in the time between his invocation of his right to remain silent and law enforcement's renewed questioning, over nineteen hours had elapsed between Grant's 1:42 p.m. invocation and the resumption of questioning at 9:03 a.m. the following day. Additionally, the court found that Grant was not given new pain medication between the 1:42 p.m. and 9:03 a.m. interrogations, which lessens concerns that medication had diminished Grant's lucidity and interfered with his ability to think about his circumstances during the substantial period between his invocation and law enforcement's renewed interrogation the following day. Thus, following his invocation of his right to remain silent, Grant had over nineteen hours to contemplate his situation before the officers recommenced their interrogation the next day. This factor weighs in favor of a finding that Grant's invocation of the right to remain silent was scrupulously honored.
>
> In sum, three of the four Mosley factors weigh in favor of concluding that Grant's invocation of his Miranda right to remain silent was scrupulously honored. We conclude that taken as a whole, the conduct of the police did scrupulously honor Grant's invocation of that right. The police clearly and regularly advised Grant of his rights and ceased questioning upon his invocation of his right to remain silent. On December 2, the officers continued to scrupulously honor his right to remain silent by waiting for nineteen hours before approaching him again and giving him fresh warnings at that time.
>
> Although Grant's statements were admitted on other grounds, the statements were admissible based on our analysis above. The court's denial of Grant's motion to suppress must be affirmed.

Grant, 2008 ME 14, ¶¶ 48 - 53, 939 A.2d at 106 -07.[5]

---

[5] The transcript of the final questioning session evidences that there were health care professionals coming in and out of Grant's hospital room during the questioning. Miranda observed with respect to a coercive atmosphere: "As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 384 U.S. at 461. There is no hint that Grant's continued inpatient status at the hospital was necessitated by anything other than his medical condition; there is no suggestion that the investigating officers hoped to keep him in the situation, to delay arraignment, in the hopes of eliciting a confession. See Mosley, 423 at 118 & n. 6 (Brennan, J. dissenting).

Grant's leading 28 U.S. C. § 2254 argument is that the basis for the Maine Law Court's affirmance of the denial of the suppression order was not built upon an argument forwarded by the State; Grant insists that the State conceded that if the court concluded that the questioning was while Grant was in custody and that he invoked his Fifth Amendment right to remain silent, then Mosley would bar re-interrogation on the same subject matter. (See Pet'r Reply Mem. at 1-2.) Grant himself raised the "scrupulously honored" argument in his brief on appeal, although his argument before the Maine Law Court touched only on the distinction between his case and Mosley's that the incriminating interview was in his case not about a different crime, (Appellant Br. at 28-29). It is true that the State did not really defend the denial of the suppression on this ground. (See Appellee Br. at 16). In his motion to reconsider to the Maine Law Court, Grant pointed out that he did not initiate contact with the officers after he invoked his Miranda rights (Mot. Reconsideration at 1-2) and then stressed: "Since Grant was re-questioned on exactly the same subject matter, after he invoked his Miranda rights, Mosley cannot be read to support the Law Court's decision" (id. at 3).

With regards to the "scrupulously honored" reasoning of the Maine Law Court, the case might generate an interesting discussion of the scope of the Mosley 'exception' if Grant had obtained certiorari review of this claim by the United States Supreme Court. But, as counsel for Grant acknowledges, the potential for relief from the Maine Law Court's ruling on this claim in a 28 U.S.C. § 2254 proceeding is very slim. There are key differences between Grant's claim and that brought in Mosley that might weigh in favor of suppression. However, the Maine Law Court's determination did not involve an unreasonable application of Mosley and Miranda.[6]

---

[6]   With regards to the § 2254(d) review, and the application of Mosley, it is of no little moment that the questions in Mosley – so similar to those raised here – splintered the court with Justice Brennan writing a lengthy dissent joined by Justice Marshall, 423 U.S. at 111-21, and Justice White penning a concurrence, 423 U.S. at 107-

13

The bottom line is, with respect to meeting his "unreasonable application" burden, Mosley did not mandate that all the cited factors align in order to permit the use of the challenged statements at trial. In this way the prospect for § 2254 relief based on an unreasonable application theory vis-a-vis a "scrupulously honored" Miranda/Mosley claim is more clouded than Miranda/Mosley § 2254 claims that turn on other facets of the inquiry. Compare e,g, Gore, 492 F.3d at 1298; Weeks, 176 F.3d at 267-69 with Anderson v. Tehrune, 516 F.3d 781, 784-85 (9th Cir. 2008) (invocation of right to remain silent) (en banc); Easley, 433 F.3d at 972-75 (was officer interrogating defendant); McGraw, 257 F.3d at 516-520 (invocation of right to remain silent) ; Burket, 208 F.3d at 199-201 (invocation of right to remain silent). In Gore the Eleventh Circuit reasoned with regards to the intersection between the § 2254(d)(1) "clearly established" limitation and the "scrupulously honored" inquiry:

> Gore contends that the absence of the final Mosley factor renders the Florida Supreme Court's decision an unreasonable application of law. Here, unlike in Mosley, when questioning was resumed, it arguably concerned the same underlying crimes as the initial interrogation. Gore points to no decision of the United States Supreme Court holding either that all the factors considered in Mosley were necessary for a finding that a suspect's rights had been scrupulously honored, or that any single Mosley factor is necessary or sufficient in the "scrupulously honored" analysis.

492 F.3d at 1298 (footnote omitted). See also Weeks, 176 F.3d at 268-69 ("Applying the Mosley factors to Weeks's case, we cannot conclude that the Supreme Court of Virginia's decision to uphold the trial court's admission of Weeks's confession was contrary to or an unreasonable application of Mosley.... The fifth factor in the Mosley analysis is whether the second interrogation concerned a crime that was the subject of the first interrogation. In this case, both

---

11, leaving the Justice Stewart led majority in a middle ground. I do not suggest that the majority's opinion is not the "clearly established" law for cases involving sufficiently parallel facts. However, the discussions in the dissent and concurrence illustrate that future applications of Miranda/Mosley to suppression disputes with varying factual contexts is likely to be tough going for trial courts until there is another clarification from the Supreme Court.

interrogations concerned the same crime-- the murder of Trooper Cavazos. Where other factors indicate that a defendant's right to cut off questioning was "scrupulously honored," however, the mere fact that a second interrogation involves the same crime as the first interrogation does not necessarily render a confession derived from the second interrogation unconstitutionally invalid under Mosley.); Fleming, 556 F.3d at 528 -30 (same crime); Davie v. Mitchell, 547 F.3d 297, 308 -311 (6th Cir. 2008);  Lanosa , 2008 WL 5341856 at1  (unpublished) (same crime); Hebert, 2005 WL 147260 at 4 (unpublished)(same crime) .

Furthermore, several Circuit Courts of Appeals, including the First Circuit, have concluded that Mosley does not mandate suppression simply because the re-questioning pertained to the same crime as the initial questioning.  See Lugo Guerrero, 524 F.3d at 11 -12; United States v. Thongsophaporn, 503 F.3d 51, 55 -56 (1st Cir. 2007); United States v. Andrade, 135 F.3d 104, 107 (1st Cir. 1998); see also e.g., United States v. Schwensow, 151 F.3d 650, 659 (7th Cir. 1998); United States v. Alvarado-Saldivar, 62 F.3d 697, 699 (5th Cir. 1995); United States v. House, 939 F.2d 659 (8th Cir.1991).

Accordingly, while the Maine Law Court's application of  Miranda and Mosley to the facts of Grant's case may not be indisputably correct or error free, it is not unreasonable as that term is defined for 28 U.S.C.  § 2254(d)(1) as construed by the Supreme Court. See Williams, 529 U.S. at 362.

### *Conclusion*

I recommend that the Court deny Grant 28 U.S.C. § 2254 relief for the reasons above. I further recommend that a certificate of appealability should not issue in the event Grant files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 23, 2009.